MILDRED E. TINKHAM, conservatrix, vs. DEPARTMENT OF
PUBLIC WELFARE & another.[1]

Suffolk.   December 15, 1980. — February 27, 1981.

Present: PERRETTA, DREBEN, & NOLAN, JJ.

*Massachusetts Medical Assistance Program.   Department of Public Wel-*
*fare.   Department of Health and Human Services.   Administrative*
*Law,* Regulation, Agency's interpretation of statute.

The Department of Public Welfare was not bound by a method of calcu-
lating costs incurred for medical care by potential recipients of
Medicaid payments specified in a directive which was issued by the
United States Department of Health and Human Services without go-
ing through the procedure of notice and hearing required for prom-
ulgation of regulations, which was inconsistent with an earlier direc-
tive, and which was included in a manual stated to contain "no new or
different requirements from those in the Regulations." [509-515]

CIVIL ACTION commenced in the Superior Court Depart-
ment on August 16, 1978.

The case was heard by *Tamburello, J.*

*Mary Ellen McCarthy (Suzanne Harris* with her) for the
plaintiff.

*Gerald J. Caruso,* Assistant Attorney General, for the de-
fendants.

DREBEN, J.   The issue before us is whether the Depart-
ment of Public Welfare (DPW) is required to discard a
method of calculating "the costs . . . incurred for med-
ical care" under 42 U.S.C. § 1396a (a)(17) (1976),
which was authorized by a 1974 directive of the Depart-
ment of Health and Human Services[2] (HHS), and adopt a

---

[1] Commissioner of the Department of Public Welfare.

[2] The Department of Health, Education and Welfare was redesignated
the Department of Health and Human Services.  Pub. L. 96-88, § 509, 93
Stat. 695 (1979).

more costly procedure prescribed by a 1976 directive of
HHS.

In this action for declaratory and injunctive relief and
also for review, under G. L. c. 30A, § 14, of a decision of
the DPW denying the plaintiff's eligibility for Medicaid
payments, the trial judge upheld the DPW and refused to
order it to follow the calculations prescribed by the 1976 di-
rective which was contained in HHS' Medical Assistance
Manual.[3]  He ruled that the 1976 provision "contemplated a
material and substantial change from existing policy" and
was "of no effect because it was not promulgated pursuant
to the notice and comment provisions" of the Administra-
tive Procedure Act (A.P.A.), 5 U.S.C. § 553 (1976).  For
the reasons stated in this opinion, we agree with the trial
judge that the provision of the 1976 manual is not binding
on the DPW.

1.  *The statutory and regulatory provisions.*  Before dis-
cussing the 1974 and 1976 directives of HHS, we shall ex-
amine briefly the general framework of Medicaid and the
specific statute and regulations which the two directives im-
plement.  Medicaid is a Federal-State cooperative program
which was created in 1965 under Title XIX of the Social
Security Act, 42 U.S.C. §§ 1396 et seq. (1976 and Supp. III
1979).  Participation by the States in the program is entirely
optional, but once a State chooses to participate, it must
comply with the requirements of Title XIX.  *Harris* v.
*McRae*, 448 U.S. 297, 301 (1980).  Participating States sub-
mit their plans[4] for approval to HHS (42 U.S.C. § 1316

---

[3] At the time of trial the dispute involved one six-month eligibility
period as the plaintiff subsequently met the DPW's eligibility require-
ments.  The medical expenses at issue for that period are $1,818.

[4] Title 45 C.F.R. § 201.2 (1980) describes a State plan as "a comprehen-
sive statement submitted by the State agency describing the nature and
scope of its program and giving assurance that it will be administered in
conformity with the specific . . . [statutes], regulations . . ., and other ap-
plicable official issuances of the Department.  The State plan contains all
information necessary for [HHS] to determine whether the plan can be ap-
proved, as a basis for Federal financial participation in the State program."

[a][1] [1976]), and if approved, the Federal government will pay a specified percentage of "the total amount expended . . . as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1) (1976). *Harris* v. *McRae, supra* at 308. A State plan will be approved if it complies with the applicable "statutes and regulations." 45 C.F.R. § 201.3(d) (1980).[5]

A State which adopts a Medicaid program must provide assistance to the group referred to in the regulations as the categorically needy[6] (42 U.S.C. § 1396a[a][10][A] [1976]), and may also provide benefits to a group known as the medically needy.[7] 42 U.S.C. § 1396a(a)(10)(C) (1976). Massachusetts has elected to include both groups. General Laws c. 118E, § 1. See generally *Moe* v. *Secretary of Admn. & Fin.*, 382 Mass. 629, 633-634 (1981). The medically needy have income and resources above the limits of the categorically needy, and only receive benefits after they have incurred medical expenses which reduce their income below a prescribed level. The determination of that reduction or "spend down" is the core of the present dispute.

The time period for computing income is prescribed by regulation. DPW "must use a prospective period of not more than six months to compute income." 42 C.F.R. § 435.831(a)

---

[5] "Determinations as to whether State plans . . . originally meet or continue to meet the requirements for approval are based on *relevant Federal statutes and regulations.* Guidelines are furnished to assist the interpretation of the regulations." (Emphasis supplied.) 45 C.F.R. § 201.3(d) (1980).

[6] Title 42 C.F.R. § 435.4 (1979) states: "'Categorically needy' means aged, blind or disabled individuals or families and children who are otherwise eligible for medicaid and who meet the financial eligibility requirements for AFDC, SSI, or an optional State supplement."

[7] Title 42 C.F.R. § 435.4 (1979) states: "'Medically needy' means aged, blind, or disabled individuals or families and children who are otherwise eligible for medicaid and whose income and resources are above the limits prescribed for the categorically needy but are within limits set under the medicaid State plan."

(1979). However, neither the statute, 42 U.S.C. § 1396a
(a)(17) (1976),[8] nor the regulations promulgated thereunder
specify the time period during which medical expenses must
be incurred in order to reduce income of a given period. In
this connection, we note that there are two sets of regula-
tions which we consider. Although the parties have not
suggested that the current regulations which were first
issued in 1978 do not apply to the plaintiff's claim, we
assume, without deciding, that the regulations in force at
the time of the eligibility period under dispute are ap-
plicable to that claim.[9] For purposes of declaratory (and

---

[8] Title 42 U.S.C. § 1396a (a)(17) (1976) provides in relevant part that a
State plan must, in setting reasonable standards for eligibility: "provide
for flexibility in the application of such standards with respect to income
by taking into account, except to the extent prescribed by the Secretary,
*the costs* (whether in the form of insurance premiums or otherwise) *incur-
red for medical care* or for any other type of remedial care recognized
under State law" (emphasis supplied).

[9] Title 42 C.F.R. § 448.3(c) (1977) was in effect at the time of the plain-
tiff's application for medical assistance, February 2, 1978. In relevant
part, it states that a State plan must:
   "(2) Provide that there will be a flexible measurement of available in-
come which will be applied in the following order of priority:

   "(i) First, for maintenance, so that any income in an amount at or
   below the established level will be protected for maintenance, . . ..
   "(ii) Next, income will be applied to costs incurred for medical in-
   surance premiums . . . and for necessary medical or remedial care
   recognized under State law and not encompassed within the State
   plan for medical assistance. *States may set reasonable limits on
   such medical services for which excess income may be applied . . .*
   [emphasis supplied].
   "(iii) All of the remaining excess income . . . will be applied to costs
   of medical assistance included in the State plan. Once such income
   . . . [is] exhausted, the full amount, duration and scope of care and
   services provided by the plan are available.

   "(3) Provide that all income and resources will be considered in establish-
ing eligibility, and for the flexible application of income to medical costs not
in the plan, and for payment toward the medical assistance costs. . . .

   "(4) Provide that only such income and resources will be considered as
will be 'in hand' within a period, not in excess of six months ahead,
including the month in which medical services which are covered under
the plan were rendered."

injunctive) relief, however, we look to the current regulations.[10] As will become evident in the course of this opinion, we consider that the regulations in effect both in 1977 and in 1978 are consistent with the position of the DPW on "spend down".

2. *The 1974 directive and the 1976 manual instruction.* On August 20, 1974, HHS issued a directive requiring States to submit a form, "Attachment 2.6-C," if their State plans included the medically needy. The directive contained an explanation of the various items on the form including a discussion of the computation of excess income and medical expenses.

An examination of the relevant portions of the 1974 HHS directive leads us to conclude, as did the trial judge, that the present method used by the DPW to compute spend down was "specifically authorized" by the 1974 directive.[11] We

---

[10] HHS, in promulgating the 1978 regulations which are currently in effect, stated that these regulations contained "[n]o substantive changes." The regulations were published pursuant to a finding under 5 U.S.C. § 553(b)(B) (1976), that "notice and public procedure thereon" were unnecessary "for good cause", on the grounds of time restraints and also because HHS considered the 1978 recodification merely a simplification and clarification of existing regulations "without . . . substantive change". The publication notice did, however, state that HHS would "consider comments or objections from anyone who believes that this rewriting changes current policy." 43 Fed. Reg. 45176 (September 29, 1978).

We note, however, that the sentence appearing at the end of the quoted portion of 42 C.F.R. § 448.3(c)(2)(ii), see italicized portion of note 9, was replaced by the following provision at 42 C.F.R. § 435.831(c)(2) (1979), which may have made a change in meaning: "The agency [DPW] may set reasonable limits on the *amounts* of incurred medical expenses to be deducted from income" (emphasis supplied).

[11] The relevant part of the August 20, 1974, directive relates to "Item II-A-3a, Excess income — period considered" and provides as follows:

"The calculation of available income in order to assess the amount of excess income applicable to medical care and services is done on a prospective monthly basis, not to exceed a total of 6 months ahead. However, where the individual is eligible on a retroactive basis, the period for computation of excess income would include the 3-month retroactive coverage period, resulting in a *maximum* period of 9 months for which excess income may be computed. In this case, medical expenses incurred

find it unnecessary to give a detailed explanation of the DPW method and merely note that it provides that excess income for a given period (six months forward and three months back) can only be offset by medical expenses incurred during the same period. We also conclude that the Massachusetts State plan, as last approved by HHS in 1978, contemplated that method of spend down. [12]

It does not appear in the record whether the 1974 directive was part of the medical assistance manual of HHS, but it is clear that the "Action Transmittal" of July 8, 1976, became § 4-30-30 of the manual. The manual was first issued to participating States in 1971, and is described therein as an "official medium by which the Medical Services Administration issues guides and procedures to States." It "clarifies, explains, and expands upon the meaning of the Regulations and the provisions upon which they are based." In a paragraph headed "Relationship to Regulations," the following statement is made: "The material contained in this Manual is consistent with the Regulations on the subjects and *contains no new or different requirements from those in the Regulations*" (emphasis supplied).

"Action Transmittal" of July 8, 1976, containing § 4-30-30, was sent to the States as a new insert for the manual and was not published in accordance with 5 U.S.C. §§ 552(a)(1) and 553(b) (1976) of the A.P.A. Section 4-30-30 provides, with certain qualifications not here ap-

---

during the 3-month retroactive period would be applied toward the amount of excess income for the total 9-month period.

"It should be noted that the State must allow the individual the same number of months to spend-down as it allows in the computation of excess income; e.g., the individual may not be required to spend-down 6 months of excess income in a 2-month period."

[12] The parties stipulated that exhibit 13, State plan "Attachment § 2.6-C", came into the State plan pursuant to the August 20, 1974, directive and that the relevant pages of that directive included the material quoted in note 11, *supra*. Since we have construed that material as authorizing the method currently used by the DPW, we conclude that "Attachment 2.6-C," which is part of the State plan, incorporates the method authorized in the explanatory part of the directive.

plicable, that "any medical expenses which are the current liability of the applicant shall be considered including: (1) unpaid expenses *incurred at any time* prior to the date of application, providing the applicant remains liable for payment" (emphasis supplied).

We agree with the trial judge that this provision "materially affects Massachusetts' liability under its Medicaid plan." Section 4-30-30 prohibits the DPW from computing spend down under the method sanctioned by the 1974 directive. Medical expenses whenever incurred must be used to reduce income.

3. *Effect of the 1976 manual provision.* The DPW concedes that HHS has the delegated legislative power under 42 U.S.C. §§ 1302 and 1396a (a)(17) (1976 and Supp. III 1979), see note 8, *supra*, to fill the interstices of the statute by properly promulgated regulations.[13] Such regulations could set a specific time or even an unlimited time period during which incurred medical expenses could be used to reduce income. We assume that such regulations would be binding on the DPW. However, the Secretary has chosen not to treat the spend down as a "legislative-type rule", see *Morton v. Ruiz*, 415 U.S. 199, 236 (1974), and has, as we have seen, left the regulations silent on the time when medical expenses must be incurred in order to be considered.

The plaintiff, as does HHS,[14] claims that although HHS did not issue its directive as a regulation pursuant to § 553,

---

[13] Although 5 U.S.C. § 553(a)(2) (1976) excludes "matter[s] relating to . . . grants, benefits, or contracts," HHS on January 28, 1971, 36 Fed. Reg. 2532 (1971), determined that "participation by the public" in the formulation of rules and regulations outweighs "any administrative inconvenience or delay which may result from use of the A.P.A. procedures." Accordingly, all agencies of the Department were directed to utilize the public participation procedures of the A.P.A., 5 U.S.C. § 553. HHS has thus placed itself under the structure of A.P.A. procedures. See *Morton v. Ruiz*, 415 U.S. 199, 233 (1974); *National Welfare Rights Organization v. Matthews*, 533 F.2d 637, 646 (D.C. Cir. 1976).

[14] HHS is not a party to this suit. The panel hearing this appeal asked the parties to submit briefs and also invited HHS to submit a brief as an

HHS was not required to do so. The plaintiff relies on 5 U.S.C. § 553 (b)(A) (1976), which exempts "interpretative rules" from the operation of § 553, and urges that § 4-30-30 is an interpretive rule. She claims that the provision, even if not binding, is entitled to great weight as a directive of the agency administering the statute. The DPW on the other hand, claims that the "interpretive" label placed on the manual provision by HHS is not dispositive, that the provision is a change from prior practice and has substantial impact on the Commonwealth, and that in such circumstances it is not binding because it was not promulgated in accordance with the requirements of 5 U.S.C. § 553 (1976).

The DPW's position was adopted by the trial court. There is considerable and persuasive authority that if a directive has substantial impact this fact, and not the label placed thereon by the agency, determines whether the safeguards of the A.P.A. are applicable. Courts adhering to this view characterize such a directive as a substantive or legislative rule subject to § 553.[15] Other courts do not attempt to distinguish between "interpretive" (or procedural rules which are also exempt) and "substantive" rules, but reach the same result by looking at the basic purpose of the

_____

amicus curiae, pursuant to Mass.R.A.P. 17, 365 Mass. 864 (1974), on the need or feasibility of HHS participation in this case. The parties argued that HHS was not a necessary party, and its participation would only cause delay. HHS, through its deputy regional attorney, in a letter responded that "we do not believe it is either necessary or feasible for HHS to participate" in this litigation, and "we would respectfully decline" the invitation.

The letter also states: "At the same time, however, we do believe that the position of HHS is before the court, insofar as relevant pages of our Medical Assistance Manual and correspondence from our Department have been introduced as exhibits in the litigation. Those materials continue to reflect the position of our department."

[15] E.g., Joseph v. United States Civil Serv. Comm., 553 F.2d 1140, 1153 (D.C. Cir. 1977); Chamber of Commerce v. Occupational Safety & Health Admn., 636 F.2d 464, 468-470 (D.C. Cir. 1980); Saint Francis Memorial Hosp. v. Weinberger, 413 F. Supp. 323, 327-330 (N.D. Cal. 1976).

statutory requirements of § 553. They hold that, whatever the characterization, the exemption in § 553(b)(A) does not extend to rules which depart from existing practice and have a substantial impact on the persons regulated.[16]

These authorities and a number of variations thereon[17] show a judicial reluctance to allow an agency, a body which may be insulated from any political accountability, to impose binding rules which materially affect rights or liabilities without an opportunity to gain the benefit of the views of the parties affected. A similar reluctance by Congress led to the passage of § 553 of the A.P.A. Both are based on considerations of fairness to the parties affected as well as on the premise that a fully responsible and thoughtful decision can only be reached after consultation with or comment by interested persons. *Chamber of Commerce* v. *Occupational Safety & Health Admn.*, 636 F.2d 464, 470-471 (D.C. Cir. 1980). See *Saint Francis Memorial Hosp.* v. *Weinberger*, 413 F. Supp. 323, 329 (N.D. Cal. 1976); *Pharmaceutical Manufacturers Assn.* v. *Finch*, 307 F. Supp. 858, 864, 866, 868 (D. Del. 1970). See generally A Functional Approach to the Applicability of Section 553 of the Administrative Procedure Act to Agency Statements of Policy, 43 U. Chi. L. Rev. 430 (1976). The opportunity for comment

[16] E.g., *Lewis-Mota* v. *Secretary of Labor*, 469 F.2d 478, 481-482 (2d Cir. 1972); *Brown Exp., Inc.* v. *United States*, 607 F.2d 695, 702 (5th Cir. 1979); *Pharmaceutical Manufacturers Assn.* v. *Finch*, 307 F. Supp. 858, 863 (D. Del. 1970); *Aiken* v. *Obledo*, 442 F. Supp. 628, 649 (E.D. Cal. 1977).

[17] Some courts have held agency directives which have general applicability invalid on the ground that the publication requirements of 5 U.S.C. § 552 (a)(1)(D) (1976) were not met. E.g., *Anderson* v. *Butz*, 550 F.2d 459, 462-463 (9th Cir. 1977). Other authorities suggest that where an agency has the substantive authority to issue binding regulations, the agency designation should be respected. However, this position still leaves open the question whether the regulation should, on principles of fairness, be promulgated so that interested parties have an opportunity to comment or influence the agency. 2 Davis, Administrative Law § 7.18 (2d ed. 1979). See *Chamber of Commerce* v. *Occupational Safety & Health Admn.*, 636 F.2d at 471-472 (Bazelon, J., concurring).

is clearly appropriate here where the party affected is a State agency which itself has considerable expertise in assessing the financial impact of the provision on the State.[18]

In this case, however, we find it unnecessary to hold the provision invalid as applied to the DPW on the ground that it did not comply with A.P.A. requirements. This is so because even if we were to accept HHS' view that § 4-30-30 is interpretative, and were also to accept that it is not subject to 5 U.S.C. § 553 (1976) despite its impact, we do not find the provision entitled to such deference as to be binding on the DPW. We may properly reach this conclusion because if a particular agency pronouncement may be lawfully issued without going through the procedure of notice and hearing required for a regulation, that pronouncement "does not have the binding force attributable to a full-blown regulation." *Massachusetts Gen. Hosp.* v. *Rate Setting Commn.*, 371 Mass. 705, 707 (1977). *Cerro Metal Prod.* v. *Marshall*, 620 F.2d 964, 981 (3d Cir. 1980).

The weight to be accorded to an agency judgment "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944). Judged by these criteria, § 4-30-30 can muster little strength. It is a new rule, not one of long standing. It precludes State procedures sanctioned by the prior 1974 directive. See *supra*, part 2. Moreover, it is not consistent with the avowed functions of the manual, which, as we noted earlier, specifically states that it contains no "new requirements from those in the regulations." If the first (1974) directive was, in accordance with the intent of the manual, merely a clarification of the regulations, the second, which requires a material change in DPW's procedures, cannot be passed off as con-

---

[18] We note that adverse comments of Governors and other State officials have indeed changed the form of proposed regulations. See *Florida* v. *Mathews*, 422 F. Supp. 1231, 1245-1246 (D.D.C. 1976).

taining "no new requirements." Because of the inconsistency in HHS' position on spend down and because of the use of the manual in a manner contrary to its expressed purpose, we do not accord the 1976 provision "the weight normally given to" an administrative interpretation. *Perry* v. *Commissioner of Corps. & Taxn.*, 5 Mass. App. Ct. 780, 781 (1977). See *General Elec. Co.* v. *Gilbert*, 429 U.S. 125, 141-145 (1976).

In addition, HHS has given no indication of a thorough consideration of the implications of its policy change. To the contrary, the fact that the 1976 provision altered the prior rule without explanation and was adopted without any opportunity for comment by State agencies suggests that it was issued without full information as to its financial and other impact on such agencies. These are matters where the expertise of State officials would be most valuable to an informed judgment by HHS. Cf. *Pharmaceutical Manufacturers Assn.* v. *Finch*, 307 F. Supp. at 866; *Saint Francis Memorial Hosp.* v. *Weinberger*, 413 F. Supp. at 329.

Nor does the 1976 "interpretation" seem more persuasive than the one of 1974. In the absence of a reason to the contrary, it seems natural to use the same period for computing expenses and income. Neither the statute nor the regulations in effect in 1977 or in 1978 require the interpretation urged by the plaintiff; moreover, the propriety of the State putting a time limit on medical expenses seems authorized by the 1978 regulation. See note 10, *supra*. For these reasons, without passing on the wisdom of either of the two directives, we hold that the DPW is not bound to discard its previously authorized method and accept the rewritten position of HHS contained in the 1976 manual.[19] See *Daughters of Miriam Center for the Aged* v. *Mathews*, 590 F.2d 1250, 1263 (3d Cir. 1978); *Cerro Metal Prod.* v. *Marshall*, 620 F.2d at 982.[20]

---

[19] Of course, if DPW so chooses, it may adopt the provision.

[20] As a consequence, we need not decide whether HHS' approval of the State plan either prior or subsequent to the issuance of § 4-30-30 is, in

The judgment is to be modified to declare that DPW is not bound by the 1976 manual provision, and as so modified is affirmed.

*So ordered.*

itself, such agency action which takes precedence over the 1976 manual provision. See *County of Alameda* v. *Weinberger*, 520 F.2d 344, 351 (9th Cir. 1975).