BOARD OF EDUCATION vs. SCHOOL COMMITTEE OF AMESBURY.

Suffolk. March 21, 1983. — August 10, 1983.

Present: BROWN, ROSE, & KASS, JJ.

*School and School Committee*, Special education. *Injunction. Practice, Civil*, Interlocutory appeal. *Administrative Law*, Regulations, Agency.

Regulations of the Department of Education contained in 603 Code Mass. Regs. § 202.1(e) (1979) provided no principle of general applicability under which the department could assign financial responsibility for the special educational needs of an institutionalized child whose parents had resided for successive short periods in several towns before moving permanently to another State. [512-514]

Where G. L. c. 71B, § 3, governing special education programs, referred to the issuance of "guidelines and directives" by the Department of Education acting jointly with the Departments of Mental Health and Public Health, a practice of the Department of Education, evidenced only by the affidavit of a departmental official and by that department's correspondence with a single town's school committee, did not constitute a guideline or directive on which the department could appropriately rely in assigning to that school committee the financial responsibility for special educational services to an institutionalized child whose parents had moved to another State. [514-515]

Discussion of the types of governmental action which courts have regarded as establishing administrative policy or interpretations. [515-517]

CIVIL ACTION commenced in the Superior Court Department on June 4, 1982.

A motion for a preliminary injunction was heard by *Sullivan*, J.

A proceeding for relief from an interlocutory order was heard in the Appeals Court by *Grant*, J.

*Maria I. Lopez*, Assistant Attorney General, for the plaintiff.

*James D. Olivier* for the defendant.

*Richard F. Howard* for the intervener.

KASS, J.  Beneath the relatively narrow issue of whether a single justice of this court correctly suspended a preliminary injunction lies the question whether, in a case where a child's parents no longer live in Massachusetts, the Department of Education has properly assigned to the school committee of Amesbury financial responsibility for special needs education (see G. L. c. 71B, inserted by St. 1972, c. 766, § 11) on the basis of the parents' last known residence in the Commonwealth.

Cindy P., the child in question, is blind (a consequence of retrolental fibroplasia), mildly retarded, and subject to emotional difficulty which manifests itself in throwing, stealing, and breaking objects, stealing medications, and hitting or pushing others.  She was born July 8, 1960.  From age six to twelve Cindy attended Perkins School for the Blind.  During the 1973-1974 school year, her family lived in Haverhill, and she was in a special class in the Haverhill public schools.  The family then moved to Newburyport and, following an evaluation, that city's school system recommended a placement at the Protestant Guild for the Blind.

Cindy's parents appear to have experienced difficulty in coping with her and, with their consent, custody of Cindy, by order of a Probate Court judge, was placed on March 6, 1975, with the Reverend Wesley Price, the executive director of the Protestant Guild for the Blind.  Whether Newburyport paid her expenses at the Protestant Guild for the Blind that spring is not clear from the record.  Some time before October, 1975, however, Cindy's family moved back to Haverhill, and it appears Haverhill picked up the tab for her placement, presumably in accordance with G. L. c. 71B, although the record is at best indirect on that point.  Her attendance at the Protestant Guild for the Blind was interrupted by a sojourn of undisclosed length at Metropolitan State Hospital.  The following November, i.e., in 1976, the family located again in Newburyport, and Newburyport resumed paying her special education costs at the Protestant Guild until March, 1978, when Newburyport received information that the P. family had moved to Amesbury.  In

late 1979, Cindy was transferred from the Protestant Guild and resumed attendance at Perkins School for the Blind, where she remained until March, 1981, when she was again transferred to Metropolitan State Hospital.

By August, 1978, Cindy's parents had moved to New Hampshire, and they have not returned to Massachusetts since. Cindy has never been enrolled in the Amesbury school system, and the record does not suggest that her parents, during their brief residence in Amesbury, called her to the attention of the school authorities in Amesbury or that they requested an evaluation under G. L. c. 71B, § 3. Compare *School Comm. of Brookline* v. *Bureau of Special Educ. Appeals,* 389 Mass. 705, 707 (1983).

An officer of the Amesbury public schools notified the Protestant Guild for the Blind in writing that "Amesbury would . . . assume . . . financial responsibility for Cindy beginning April 1, 1978." It is not clear from the record when Amesbury school officials first became aware that Cindy P.'s parents had left Amesbury and the State. A letter dated December 21, 1978, from the Department of Education instructs the administrator of special education for the Amesbury public schools that the department was "assigning Amesbury continuing responsibility for Cindy's educational needs" on the ground that "one of the major criteria used [for assignment of financial responsibility] is the last known Massachusetts residence of the parents." Amesbury, on March 19, 1981, asked the Department of Education (Department) to reconsider and said that "from this point on" it was suspending payments on Cindy's behalf, eliciting letters dated July 2, 1981, and July 16, 1981, which restated the Department's position that the Amesbury public schools were responsible for all aspects of Cindy's educational program. According to an affidavit by Amesbury's superintendent of schools, Amesbury paid an aggregate of $23,682.85 to the Protestant Guild for the Blind and $15,031 to Perkins School for the Blind.

Before Amesbury cut off payments for Cindy she was transferred on March 6, 1981, to Metropolitan State Hospi-

tal.[1]  There she continued to be located when the Board of Education[2] brought an action to compel Amesbury to provide for Cindy's special education needs for a time equivalent to the period between the suspension of payments in March, 1981, and July 8, 1982, which was Cindy's twenty-second birthday.[3]  A judge of the Superior Court entered a preliminary injunction on June 15, 1982, ordering the school committee of Amesbury "immediately [to] take the steps necessary to arrange for Cindy P. to be transferred out of the Adult Chronic Ward of Metropolitan State Hospital and to be placed in a diagnostic program described in 603 C.M.R. § 502.9."

That was the order which the school committee asked a single justice of this court to review under G. L. c. 231, § 118, and Mass.R.A.P. 6(a), 378 Mass. 930 (1979).  The single justice suspended the preliminary injunction, noting in an accompanying memorandum that he was not "satisfied that there is any 'regulation[ ], guideline[ ] [or] directive[ ]' within the meaning of G. L. c. 71B, § 3, or even any published statement of departmental policy . . . which authorizes or purports to authorize the Division of Special Education to assign" the cost of Cindy's special education to the school committee of Amesbury.  From that action of the single justice, the Board of Education brought this appeal.

On a balance of harm test (*Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 617 [1980]), we could affirm the

---

[1] As to reasons for this transfer, we have only an affidavit of the superintendent of schools which says "Perkins . . . could no longer handle her due to her serious emotional problems and the fact that she set fire or fires at the School."

[2] The Board of Education is established under G. L. c. 15, § 1E.  The Department of Education is under the "supervision and control" of the Board of Education. G. L. c. 15, § 1, as appearing in St. 1965, c. 572, § 2. The Division of Special Education, established under G. L. c. 15, § 1F, has the power and duty under G. L. c. 15, § 1M, to recommend rules, regulations and guidelines to the Board and to issue directives.

[3] Under G. L. c. 71B, § 1, a "school age child" is "any person of ages three through twenty-one who has not attained a high school diploma or its equivalent."

order of the single justice on the ground that by the time the matter came before him Cindy had attained age twenty-two and was no longer an object of immediate concern under G. L. c. 71B (see note 3, *supra*). The single justice, however, emphasized in his memorandum that he was of opinion that the plaintiff board had not demonstrated a reasonable possibility of success on the merits and we, therefore, confront the issue the board has put: Did there exist a regulation, guideline or directive which authorized the Division of Special Education to make Amesbury responsible for her special needs after her parents left that community?

Several sections in the statutory scheme which governs special needs education confer authority upon the Department to regulate the special needs program. See G. L. c. 15, § 1M; G. L. c. 71B, §§ 2, 3, 10 & 12. Both sides to the controversy agree that the appropriate source in which to look for administrative power concerning assignment of financial responsibility is G. L. c. 71B, § 3, which, so far as material, provides: "In accordance with the regulations, guidelines and directives of the department *issued jointly with the departments of mental health and public health* . . . the school committee of every . . . town . . . shall identify the school age children *residing therein* who have special needs, . . . propose a special education program to meet those needs, [and] provide or arrange for the provision of such special education program . . ." (emphasis supplied).

"Residing therein," one of the phrases italicized above, is an easily applicable direction for matching a child with the responsible school committee in the paradigm case of a child who lives with its parents and is enrolled in the local school. The phrase is not so obviously self-defining when considerations such as split families, guardianships, children living with foster parents, relatives or friends, and institutionalized children enter the picture. The Division of Special Education (Division) has foreseen this problem and by regulation has defined "parent" to include "guardian, person acting as

a parent . . ., or surrogate parent."[4]  603 Code Mass. Regs.
§ 113.0 (1979).  In 603 Code Mass. Regs. §§ 202.1(a) through
202.1(d) (1979), the Division treats with responsibility for
children in a variety of living situations, including children
placed with foster families and in institutions.  Diverse as
are the contingencies for which the regulations have pro-
vided, the Division has recognized its inability to anticipate
them all and has added § 202.1(e): "Where a child in a liv-
ing situation described in [par.] 202.1(c) or (d) [dealing
with children in institutional settings and children living
away from home but who have a father, mother or guardian
living in Massachusetts] has no father or mother or guardian
living in the Commonwealth . . ., the Department of Edu-
cation shall assign a city, town or school district to such
child for purposes of this paragraph."

Subparagraph (e) is the text upon which the Department
relies for authority to assign financial responsibility for
Cindy's special needs education to the last community in
Massachusetts where Cindy's parents lived, albeit transient-
ly.  Surely, however, we cannot read § 202.1(e) so literally
as to have it confer upon the Department power to assign
financial responsibility wherever expedient.  It is not plaus-
ible, for example, that the Department can impose Cindy
P.'s special educational expenses upon Weston or Longmea-
dow because that town is an affluent community. Assigning
financial responsibility to the last city or town where the
parents lived may, perhaps, be rational in a case where the
parents have lived in the community for some time, but in
the case of an itinerant family, as in the case at bar, the De-
partment's criterion has a certain game of musical chairs
quality about it.

Despite the board's urging that courts generally presume
the validity of an agency's action under its own regulations,
and the validity of the agency's interpretations of those reg-
ulations, we are unwilling to read § 202.1(e) so broadly as to

---

[4] For the occasions on which the Division of Special Education may ap-
point a surrogate parent and the manner in which this is to be done, see
603 Code Mass. Regs. §§ 210-212 (1979).

give the Department carte blanche to assign financial responsibility. Judicial deference to agency action, as we have very recently had occasion to observe, is not a principle of abdication. *Cliff House Nursing Home, Inc.* v. *Rate Setting Commn., ante* 300, 306 (1983). See *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976), and cases cited. Nothing in *Commonwealth* v. *School Comm. of the Blackstone Valley Vocational Regional Sch. Dist.*, 13 Mass. App. Ct. 987, 988 (1982), in which we construed the word "enrolled" as it appeared in 603 Code Mass. Regs. § 202.2 (1979) is to the contrary. Compare *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 491-492 (1978). See, for a general description of the statutory and regulatory scheme which applies to special needs education, *Isgur* v. *School Comm. of Newton*, 9 Mass. App. Ct. 290, 295-298 (1980). Especially in view of the language of the authorizing statute, G.L. c. 71B, § 3, we look for a guideline or directive which sets forth on what principles of general applicability the Department has exercised its assignment authority under § 202.1(e).

From the structure of the word and from its dictionary meaning, "guideline" implies some instruction for future conduct and, hence, the availability of that instruction in advance to the persons to be guided. See Webster's Third New Intl. Dictionary 1009 (1971). We do not understand the Department to contend that anything of the kind has been issued to Department personnel, municipal school departments, institutions delivering special education or other interested parties. The Department, however, urges through affidavit of the director of the Bureau of Program Audit and Assistance of the Division of Special Education that it has been a "consistent practice" to use the last known Massachusetts address as the "primary basis" for assigning financial responsibility. Having so informed Amesbury, the Department seems to say, its correspondence with Amesbury constitutes a directive to which a court should defer.

We are of opinion that within the meaning of G. L. c. 71B, § 3, a directive must have a less ad hoc quality. Cf.

*Morin* v. *Commissioner of Pub. Welfare, ante* 20, 24 (1983) (rejecting inconsistent interpretations of applicable regulation). The other phrase in G. L. c. 71B, § 3, which we previously emphasized requires that a directive be "issued jointly with the departments of mental health and public health," language which suggests some deliberation and collaboration with those departments in the formulation of directives.[5] There is nothing in the record which hints at the slightest participation by the other two departments in the policy the Department of Education claims to have adopted. Had such participation taken place and a policy resulted, we think that for purposes of the statute it would have to be circulated or be available to interested parties such as school superintendents and special education directors to achieve the status of a directive for purposes of G. L. c. 71B, § 3.

Certainly, administrative policy and interpretations may be announced in a manner less formal than the publication of regulations. That has been so in cases dealing with education. See *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 516 (1975), and *Amherst-Pelham Regional Sch. Comm.*, 376 Mass. at 485-486, 492 n.7. See also *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 441 n.22 (1972). It has been so with other subjects. See, e.g., *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 138-140 (1944) (interpretive bulletin issued by the Administrator of the Wage and Hour Division of the United States Department of Labor); *Ford Motor Credit Co.* v. *Milhollin*, 444 U.S. 555, 563 (1980) (Federal Reserve Board public information letters); *Atlas Distrib. Co.* v. *Alcoholic Beverages Control Commn.*, 354 Mass. 408 (1968) (letter to filers of minimum consumer resale prices); *Massachusetts Gen.*

---

[5] The Department gives attention to this statutory language in 603 Code Mass. Regs. § 216.0 (1979), which provides: "The Division shall issue periodic guidelines and directives to further define, clarify, interpret and explain these regulations. Where required by G. L. c. 71B, these shall be issued jointly with one or more of the following departments: Mental Health, Public Health, Public Welfare and Youth Services".

*Hosp.* v. *Rate Setting Commn.*, 371 Mass. 705, 706-713 (1977) (information bulletin announcing changes in rates for providers of health care). Compare *Staub* v. *Harris*, 626 F.2d 275 (3d Cir. 1980) (informal advisory letter from Federal Trade Commission was entitled to little weight). Professor Davis, in his treatise on administrative law, describes the function of interpretive rulings, and notes that in the hierarchy of rule making by the Internal Revenue Service no unpublished ruling or decision will be relied on as a precedent. 2 Davis, Administrative Law § 7:4, particularly at 18 (2d ed. 1979). See also *id.* at 160-167 (Supp. 1982). Perhaps more to the point, we observed in *Tinkham* v. *Department of Pub. Welfare*, 11 Mass. App. Ct. 505 (1981), in connection with an "interpretive directive," that courts are reluctant to "allow an agency, a body which may be insulated from any political accountability, to impose binding rules which materially affect rights or liabilities without an opportunity to gain the benefit of the views of the parties affected." *Id.* at 513.

It has been uniformly characteristic of those cases in which courts have given weight to agency interpretation that the interpretation has been circulated or available to the parties likely to be concerned by memorandum, bulletin, letter, or other form of communication. The benefit of such communication is not only the dispensing of common knowledge to those affected but the illumination of problems which may require legislative intervention.

The instant case is illustrative. An institutionalized child has, in effect, been left in Massachusetts by parents who have moved out of State. A threshold question, surely, is whether any city or town in Massachusetts should, in such circumstances, be required to foot the special education bill or, to put the question another way, to the extent that the Department's task under the statute is to determine where the child resides, can it discharge that task by alighting upon a town where she quite obviously does not reside? If she is resident in any municipality, it is the one in which the institution she attends is located. Obviously it would impose

an unbearable burden on communities which are hosts to institutions for handicapped children[6] if they became liable for the special needs education of all the children enrolled in them.[7] The fairness of saddling the last community in which the parents resided depends, in fair measure, on the length of their residence and the age of the child. If parents were to leave Massachusetts when a child is six, it would seem doubtful that the town in which they last lived ought to pay for the child's special needs expenses during fifteen years (i.e., until age twenty-two) when the town receives no support in taxes from the absent parents. Whether the expenses in a case such as Cindy's should be borne by the Commonwealth or can be made to be borne by the new host State is perhaps more a legislative question than an administrative one.[8] In making that observation we do not intimate that the Department is powerless to act through an appropriately adopted regulation, guideline or directive. The very process of promulgation and distribution, however, is likely to produce a policy more adaptive to varying circumstances, to take account of all the provisions of c. 71B, or to call attention to the desirability of legislative remedy.

---

[6] Perkins Institute for the Blind and the Protestant Guild for the Blind, for example, are both located in Watertown.

[7] For similar reasons it was wise of the Department to interpret 603 Code Mass. Regs. § 113.0 (1979) so as not to require that the community of residence of the Reverend Mr. Price of the Protestant Guild for the Blind, whose temporary custody of Cindy seems never to have been terminated, be responsible for her special needs expenses.

[8] General Laws c. 71B, § 10, provides for the promulgation of regulations by the Department of Education (acting jointly with the Departments of Mental Health, Public Health, Youth Services and Social Services) "defining the circumstances in which the commonwealth shall bear all or part of such cost [of educating a child outside a school system]." Section 10 adds a proviso, however, which establishes a minimum contribution (based on average per pupil cost) by a school system. The proviso may be effective only if there is an identifiable school system. See also G. L. c. 71B, § 12, relative to the maintenance of special education programs in State institutions and contributions to the cost of such education by the municipal school department which the child would "normally be eligible to attend."

Having concluded that there was no regulation, guideline or directive of the Department under which it could assign financial responsibility for Cindy's special educational needs to Amesbury's school department, we affirm the suspension by the single justice of the preliminary injunction issued by the Superior Court. A judgment shall be entered in the Superior Court dismissing the complaint of the Board of Education.

*So ordered.*