TRUST INSURANCE COMPANY *vs.* COMMONWEALTH
AUTOMOBILE REINSURERS & another[1]; AMICA MUTUAL
INSURANCE COMPANY, intervener.

No. 97-P-1658.

Suffolk. November 17, 1998. - April 22, 1999.

Present: LAURENCE, KAPLAN, & DREBEN, JJ.

*Insurance,* Motor vehicle insurance. *Administrative Law,* Rulemaking.

Where an insurer had notice and an opportunity to be heard with respect to a
  proposed method of allocating excess involuntary motor liability insurance
  among insurers, and did not claim or show any prejudice or unfairness to
  itself (or others) from the Commonwealth Automobile Reinsurers' (CAR's)
  adoption of the method by publication in its manual rather than promulgat-
  ing it by rule, the insurer was not entitled to a judgment holding the
  method invalid, notwithstanding that CAR should have promulgated the
  method by rule. [662-664]

CIVIL ACTION commenced in the Superior Court Department on
September 22, 1995.

The case was heard by *Thayer Fremont-Smith*, J.

*Mark G. Matuschak* (*James J. Nicklaus* with him) for Com-
monwealth Automobile Reinsurers.

*Francis J. Sally* for the plaintiff.

DREBEN, J. After the adoption in 1995 by Commonwealth
Automobile Reinsurers (CAR) of a new method of transferring
excess involuntary motor liability insurance among insurers,
one insurance company, Trust Insurance Company (Trust), ap-
pealed the decision to the Commissioner of Insurance (commis-
sioner). Trust claimed that the method should have been
promulgated by CAR as a rule rather than by publication in its
manual. The hearing officer ruled against Trust, but on appeal, a
Superior Court judge held CAR's action invalid and remanded
the matter to CAR for further proceedings consistent with its

---

[1]Commissioner of Insurance.

rule making requirements. While we agree that the method should be promulgated by rule, in the circumstances where Trust participated in open meetings addressing the method, where it and all other motor vehicle liability insurers had full opportunity to articulate their views, where the meetings were attended by a broad spectrum of the motor vehicle insurance business, and where Trust does not contend that the method is unfair to it (or even to others), we conclude that Trust has not shown any prejudice by CAR's failure to promulgate the method as a rule, and hence is not entitled to an invalidation of the method. Accordingly, the judgment holding the method invalid as to Trust is reversed, and the matter is remanded to the Superior Court to enter a judgment dismissing Trust's appeal.[2]

We turn to the relevant statute. General Laws c. 175, § 113H, is a statutory scheme providing motor vehicle liability insurance to applicants who are otherwise unable to obtain insurance — the involuntary or residual market — and under which the resulting expenses and losses (CAR's deficit) are apportioned among motor vehicle insurance companies. *Southeastern Ins. Agency, Inc.* v. *Lumbermens Mut. Ins. Co.*, 423 Mass. 1008, 1009 n.2 (1996). *Reliance Ins. Co.* v. *Commissioner of Ins.*, 31 Mass. App. Ct. 581, 582 n.2 (1991). All motor vehicle insurers licensed to do business in Massachusetts are required to participate as members of CAR in a plan prepared by its governing committee and approved, after public hearing, by the commissioner. See *Hartford Acc. & Indem. Co.* v. *Commissioner of Ins.*, 407 Mass. 23, 24 (1990). The plan in art. I provides that the governing committee[3] "shall" adopt a set of rules, including "[r]ules providing for the fair and equitable distribution of . . . losses and expenses." Article X of the plan sets forth the procedure for promulgating rules.[4] The rules, in turn, permit the

---

[2]We assume that CAR, in order to assure the validity of the method as to all persons affected, will promptly undertake to promulgate the method as a rule in accordance with its rule making requirements.

[3]The committee is appointed by the commissioner and consists of representatives from private insurers and private insurance producer associations. See G. L. c. 175, § 113H(B).

[4]In relevant part, art. X provides:

> "All Rules of Operation specifically required by this Plan and all others necessary for the efficient operation of C.A.R. shall be prepared by the Governing Committee and submitted to the Commissioner for approval. A copy of the proposed Rules of Operation prepared by the Governing

governing committee to prepare a "Manual of Administrative Procedures."[5]

This dispute concerns CAR's adoption in 1995 of a new method providing relief to "oversubscribed" motor vehicle insurers — those who service a higher percentage of the involuntary market than their percentage share of the voluntary market — by transferring some of their involuntary market share to "undersubscribed" insurers — those who service a lower percentage of the involuntary market than their percentage share of the voluntary market.[6,7] Both CAR and Trust

---

Committee shall be sent to each Member Company, each association of insurance Producers, the Public Protection Division of the Office of the Attorney General, and the Commissioner. The Commissioner shall hold a public hearing on a proposed Rule if a request for such a hearing is made by a Member Company, association of insurance producers, or the Attorney General within five days of that party's receipt of the proposed Rule. A Rule of Operation proposed by the Governing Committee shall become effective either upon the approval of the Commissioner or upon the expiration of thirty days from the time of submission provided that no public hearing has been requested on the Rule and the Commissioner has not previously disapproved the Rule."

[5]As stated in the manual's introduction:

"The purpose of the Manual of Administrative Procedures is to provide the detailed instructions needed to operate the Commonwealth Automobile Reinsurers (CAR) successfully. It supplements the Plan and Rules of Operation *but does not add any new policy requirements beyond those contained in the Plan and Rules.*" (Emphasis supplied.)

[6]The involuntary market (both before and after the 1995 change of method challenged here) was assigned through requiring insurers to have involuntary relationships with agents or brokers, otherwise qualified, who were unable to obtain a voluntary relationship with an insurance company for motor vehicle insurance, often those in inner cities, because losses in such localities were higher. Agents or brokers appointed to such involuntary relationships are called Exclusive Representative Producers, or ERPs.

[7]The new method, called "Private Passenger Subscription Methodology," provides that an insurer having 125 per cent or more of the share of involuntary insurance (i.e., more than the percentage of its voluntary market share) may request that CAR staff randomly reassign that insurer's ERPs (see note 6, *supra*) to the insurers who are the most undersubscribed until its oversubscribed level declines to 110 per cent. The method also provides a weighing system whereby ERPs appointed to an insurer prior to January 1, 1984, are weighted at twenty per cent more than other ERPs on the assumption that these ERPs suffer a higher loss ratio than other ERPs. The method

acknowledge that the larger an insurer's share of the involuntary market, the larger the share it has to pay of CAR's deficit.[8]

The genesis of the new method was a claim in 1993 by an insurer, Amica Mutual Insurance Company (Amica), an intervener in the present action, that it was oversubscribed with ERPs. It sought relief, first from CAR's governing committee where it was unsuccessful and then from the commissioner.[9] The hearing officer remanded Amica's appeal to CAR with instructions to reconsider the matter. Amica submitted a proposal to resolve its problem and to provide guidelines for a general handling of oversubscription matters in the future. After an open meeting of an ad hoc committee created to examine the problem of oversubscription of ERPs in February, 1995, and meetings of the governing committee of CAR on March 15, 1995, and April 19, 1995 — Trust was present at all three meetings — the Amica proposal was adopted by the governing committee of CAR in modified form at the April 19, 1995, meeting.

Trust, an undersubscribed insurer at the time of the adoption of the new methodology, opposed the plan at these meetings and, at the April meeting of the governing committee, specifically stated that the new method should be adopted as a rule, rather than as an amendment to the manual. After the April adoption of the new method, Trust appealed to the commissioner. See note 9, *supra*. Trust did not request a public hearing within five days although there was precedent for such a request

---

also bars certain two-party agreements between an insurer and an ERP.

Prior to 1995 each insurer had a minimum number of ERP exposures but there was not an upper level of oversubscription at which insurers would be eligible to seek relief, there was no weighing system for ERPs, and the method was less restrictive in allowing agreements between an insurer and an ERP. The prior practice was not contained in the rules or in the manual.

[8]Rule 11, the rule which "contains the formulae for determining each insurance company's share of expenses and losses incurred on the [involuntary] market policies passed on to CAR by the member companies," *Hartford Acc. & Indem. Co.* v. *Commissioner of Ins.*, 407 Mass. at 25, was not contained in the record. Since we cannot take judicial notice of the rule, *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 772 & n.12 (1980), we cannot gauge the extent of the impact of the 1995 method.

[9]The appeal was taken pursuant to rule 20 of CAR, art. X of the plan, and G. L. c. 175, § 113H. The same procedure was followed by Trust in the present case, and all parties take the position that the form of appeal is proper.

even if the action taken was not in the form of a rule.[10] The hearing officer noted that Trust "concurs that the sole issue before the Division in this matter is one of procedure: whether the Private Passenger Subscription Methodology [the new method] should have been adopted as a CAR Rule of Operation rather than as part of CAR's Manual of Administrative Procedures."

The hearing officer detailed the historical development of the method, construed CAR's rules as giving the governing committee wide latitude, and noted particularly that CAR's rule 4(C)(5), authorizing the preparation of a manual, does not limit its contents. There are no restrictions on what "pertinent information" may be included therein.[11] In his view, the new method was not a policy change because it had formerly been CAR's policy to implement the fair and equitable distribution of ERP business among motor vehicle insurers.

As an additional basis for his decision, the hearing examiner found no injury to Trust as it had had the opportunity for notice, hearing, and review by the commissioner both in the adjudicatory proceeding and in the numerous public meetings held by CAR both before and after the remand of Amica's appeal.

The Superior Court judge thought otherwise and concluded that the changes, see note 7, *supra*, involved the adoption and institution of new policies which substantially altered the rights and interests of regulated parties, including the plaintiff. The method did not merely fill in details nor was it merely directed to the internal management of the agency. See *Massachusetts Gen. Hosp.* v. *Rate Setting Commn.*, 371 Mass. 705, 707 (1977). Noting that an appeal is not the legal and functional equivalent of a public hearing, he concluded that since the method had not been promulgated in accordance with CAR's own rule making procedure, it was invalid.

---

[10]On another occasion CAR undertook a limited physical redistribution of ERPs and did not do so by rule. In that case, there was a request within five days for a public hearing and a public hearing was held.

[11]Rule 4(C)(5) authorizes the governing committee "to prepare a Manual of Administrative Procedures which shall contain instructions for the statistical recording and reporting of C.A.R. business; auditing and claim review procedures; and *other pertinent information*" (emphasis supplied).

In its appeal from that decision,[12] CAR lays stress on the fact that it is not an administrative agency to which the rule making requirements of G. L. c. 30A apply, and therefore the Superior Court judge should not have looked to the standards of c. 30A even as guidelines. CAR's argument, however, fails to recognize the judicial and legislative reluctance to allow a statutorily created body "to impose binding rules which materially affect rights or liabilities without an opportunity to gain the benefit of the views of the parties affected." *Tinkham* v. *Department of Pub. Welfare*, 11 Mass. App. Ct. 505, 513 (1981). This reluctance is "based on considerations of fairness to the parties affected as well as on the premise that a fully responsible and thoughtful decision can only be reached after consultation with or comment by interested persons." *Ibid.*

CAR also urges that the commissioner found (through its designee, the hearing officer) that the plan was not a policy change, but just a new method for carrying out existing policies, see note 5, *supra*, and claims that this conclusion is not only correct but is entitled to deference. The characterization, however, is not "airtight." Significant in determining whether a pronouncement is a rule (or regulation) which must go through certain procedures are the "functions or purposes that are furthered by notice and hearing." *Massachusetts Gen. Hosp.* v. *Rate Setting Commn.*, 371 Mass. at 707. As said in that opinion, "in the degree that what the agency puts forward is complex, or of broad or pervasive coverage, notice and hearing will appear increasingly plausible and useful, so that the agency's proposition will be denominated a regulation." *Ibid.*

An examination of the "Private Passenger Subscription Methodology" shows not only that it is complex, but also that it applies to all motor vehicle insurers who are or may be either oversubscribed or undersubscribed by a certain margin; it also applies to the insurance agent associations. The method sets known standards by which insurers can be forced to accept ERPs; it departs from existing practice and appears to have a substantial impact on the persons regulated. CAR has not shown the contrary.

Moreover, CAR's plan, termed its "charter and constitution," specifically requires, as noted earlier, that the governing com-

---

[12]Trust's argument that we do not have jurisdiction to hear this appeal on the ground that it is interlocutory is disposed of by *Kelly* v. *Civil Serv. Commn.*, 427 Mass. 75, 76 n.2 (1998). The remand order is final as to CAR.

mittee prepare "Rules providing for the fair and equitable distribution of . . . losses and expenses through the assessment of Member Companies." Article I of the plan. Since the allocation of ERPs bears a direct relationship to CAR's losses and expenses, it would seem that the plan itself looks to a rule as the appropriate way to implement a method which directly affects CAR's deficit. See, however, note 8, *supra.*

Despite our conclusion that the method should have been promulgated as a rule, we do not view the method as inapplicable to Trust. Before the method was adopted, every member of CAR had received the Amica proposal, a special committee had been formed to consider the issue, that committee had held a public hearing, the governing committee had held at least two public meetings, and the records of those meetings show that representatives of the Division of Insurance as well as a broad spectrum of the industry attended the public meetings.[13] Trust did not request a public hearing. See text accompanying note 10, *supra.* Most important, Trust has not shown any harm nor alleged that the method was unfair as to it. Because of the widespread publicity prior to the adoption of the method, the opportunity of all CAR members to comment, and the absence of any hint of prejudice to Trust, we hold that it is not entitled to an invalidation of the method. The public hearings held were not very different from the one envisioned (but only on request)

---

[13]Pointing to art. X of the plan, Trust argues that by adopting the method by manual rather than by rule, CAR has evaded review by the commissioner. This argument ignores the fact that representatives of the commissioner were present at all the public hearings and that the adjudicatory hearings of Amica's case and of this case were conducted by the designee of the commissioner, and also ignores, inter alia, the following portion of art. X of the plan:

> "The Commissioner may examine from time-to-time the operation of C.A.R. and the activities of its Member Companies in any manner he finds convenient and expedient. Based on such examinations and after due hearing, if the Commissioner finds any practice or activity of C.A.R. or its Members to be unfair, unreasonable, or inconsistent with public policy, the Commissioner may issue a written order specifying in what respects the practice or activity has been found unacceptable and requiring the discontinuance of such practice or activity. If any Member Company is found to have caused an inequitable distribution of risks among other Member Companies, brokers, or agents, the Commissioner may assign to that company an appropriate share of the expenses and losses arising from those risks in excess of the share it would ordinarily bear under C.A.R.'s Rules of Operation."

in art. X, and to the extent that there was a difference, Trust has shown no prejudice. See *Massachusetts State Pharmaceutical Assn.* v. *Rate Setting Commn.*, 387 Mass. 122, 129 (1982). See also *Duato* v. *Commissioner of Pub. Welfare*, 359 Mass. 635, 640 (1971); G. L. c. 30A, § 14, second par. of introduction, and § 14(7).

As indicated in note 2, *supra*, we expect CAR, in light of this opinion, to take steps to promulgate the method in the form of a rule. The judgment invalidating the method as to Trust is reversed, and the matter is remanded to the Superior Court to enter a dismissal of Trust's appeal.

*So ordered.*