van Gestel, J.
This matter comes before the Court on the requests of the plaintiffs, Liberty Mutual Insurance Company (“Liberty Mutual”) and The Premier Insurance Company of Massachusetts (“Premier”), for preliminary injunctive relief against the defendants, Linda Ruthardt, in her official capacity as Commissioner of Insurance (“the Commissioner”), and Commonwealth Automobile Reinsurers (“CAR”). What is involved is the transfer of two Exclusive Representative Producers (“ERPs”) from Horace Mann Insurance Company and Teachers Insurance Company (collectively “Horace Mann”), one ERP to Liberty Mutual and the other to Premier.

BACKGROUND

By G.L.c. 175, Sec. 113H, motor vehicle liability insurance is provided to applicants who are otherwise *200 unable to obtain Insurance — the involuntary or residual market — under a plan by which the resulting expenses and losses are apportioned among all licensed motor vehicle insurance companies. All motor vehicle insurers licensed to do business in Massachusetts are required to participate as members of CAR in a plan (the “Plan”) prepared by its Governing Committee and approved, after public hearing, by the Commissioner. The Plan provides that the Governing Committee shall adopt a set of rules, including rules providing for the fair and equitable distribution of losses and expenses. See, e.g., Trust Insurance Company v. CAR, 46 Mass.App.Ct. 657, 658 (1999).
Agents and brokers who write motor vehicle insurance in Massachusetts and who are unable to obtain voluntary relationships with an insurance company may apply to CAR for appointment to an involuntary relationship. These agents and brokers are what are referred to above as ERPs. Insurance companies that enter into such relationships are called Servicing Carriers. CAR has adopted a plan to fairly allocate ERPs based on each Servicing Carrier’s total market share. Carriers which have a smaller market share of the ERP market than their share of the total market are called “undersubscribed” companies, and they will receive additional ERPs as their applications are approved by CAR. See, e.g., Trust Insurance Company v. Commissioner, Suffolk Superior Court, Civil Action No. 95-5238, 7 Mass. L. Rptr. 64.
The Plan provides in Article V, in material part, as follows:
A Member may be excused from its Servicing Carrier responsibilities for Exclusive Representative Producer business if the Member executes an agreement with another entity for handling its share of private passenger and/or commercial motor vehicle Exclusive Representative Producer business . . . Nothing in this paragraph shall be construed to affect the right of any Servicing Carrier to enter into any contractual agreement for the purpose of servicing the Servicing Carrier’s voluntary or ceded business.
Horace Mann has been granted permission by the Commissioner and CAR to cease writing motor vehicle policies in the Commonwealth effective on December 31, 2001, and two of its ERPs have purportedly been transferred by CAR to Liberty Mutual and Premier. Liberty Mutual and Premier contend that the permission allowing Horace Mann to cease writing automobile insurance in Massachusetts and the transfers of two of its ERPs to them have not been done pursuant to CAR Rules or the appropriate statutes.
Horace Mann’s profitable, voluntary-agent-produced business has been acquired by Commerce Insurance Company (“Commerce”), but Commerce has declined to accept Horace Mann’s obligations as a Servicing Carrier to its ERPs. This is permitted by Article V of the CAR Plan.
On October 17, 2001, the Commissioner, CAR and Horace Mann executed an agreement (the “Agreement”) which purports to allow Horace Mann to refuse to write motor vehicle liability policies or bonds after December 31, 2001. Earlier in the day,[1] on October 17, 2001, the CAR Governing Committee had a special meeting “at the request of Horace Mann ... to discuss their intent to cease writing private passenger policies in the Commonwealth of Massachusetts and to determine their financial obligations to CAR pursuant to Rule 11 of CAR’s Rules of Operation.”
There is a transcript of the October 17, 2001, meeting. At the outset, counsel for Horace Mann stated: “So the issue before you [the CAR Governing Committee] today is the amount of Horace Mann’s financial obligation under CAR Rule 11, B, 3.” At the end of the meeting the motion to be acted upon by the CAR Governing Committee was stated to be: “That Horace Mann be granted the pre-credit relief that they seek, and that an ad hoc committee be assigned to look into the future, that an ad hoc committee be assigned in the future to look at the issue.” Before the vote was taken, a question was asked: “What does that precredit relief mean?” The answer given was “$6,416,630.” There followed a vote granting the motion.
Aso on October 17, 2001, CAR, by a formula previously regularly applied, reassigned Horace Mann’s four ERPs, one of which was reassigned to Liberty Mutual, and another, to Premier.
Liberty Mutual then protested to the Commissioner that the effect of the CAR vote was to permit Horace Mann to avoid writing business for its ERPs without surrendering its license, claiming that to be a violation of CAR Rules. Liberty Mutual insisted that this was a “withdrawal” by Horace Mann without following the CAR Rules. Premier also filed a notice of appeal from the CAR Governing Committee’s October 17, 2001, determination.
By a letter dated November 9, 2001, the Commissioner responded to Liberty Mutual, Premier and another apparently concerned carrier, Abella Mutual Insurance Company. The Commissioner stated that she believed “that CAR staff and the CAR Governing Committee followed procedure as currently outlined in the CAR Rules of Operation, in a manner that harmonizes these rules and avoids disruption to consumers and the residual market,” and accordingly, the Commissioner approved the CAR action of October 17, 2001, and declined Liberty Mutual’s and Premier’s request for further review.
At its November 14, 2001, meeting the CAR Governing Committe pointed to the Commissioner’s letter and, after much discussion, declined to consider the Horace Mann matter any further. Indeed, Liberty Mutual’s representative at the meeting stated Liberty Mutual’s willingness to “submit the matter for reconsideration before the Commissioner and withdraw [its] *201 agenda item.” It was the consensus of the Governing Committee to agree with Liberty Mutual.
It is in this posture that the matter came before the Court on the requests of Liberty Mutual and Premier (1) to stay the November 9, 2001, decision of the Commissioner and (2) to temporarily restrain the Commissioner and CAR from enforcing paragraphs 2 and 3 of the Agreement dated October 17, 2001.

DISCUSSION

In order to prevail on their requests for a stay of the Commissioner’s decision and temporary injunctive relief, Liberty Mutual and Premier bear the burden of showing: their likelihood of success on the merits; that they will suffer irreparable harm if the relief sought is not granted; and that their harm, without the relief, outweighs any harm to the Commissioner and CAR from being enjoined. GTE Products Cop. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). "When, as here, a party seeks to enjoin governmental action, the [C]ourt also considers whether the relief sought will adversely affect the public.” Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001). See also Commonwealth v. Mass. CRINC, 392 Mass. 443, 447 (1983); Biotti v. Board of Selectmen of Manchester, 25 Mass.App.Ct. 637, 640 (1988).
The granting or denial of preliminary injunctive relief is a matter within the sound discretion of the Court. Tri-Nel Management, Inc., supra, 433 Mass. at 219.
The Commissioner and CAR did not argue the merits of the contentions by Liberty Mutual and Premier that the CAR Rules and applicable law were not followed in reaching the October 17, 2001, decision or in the Commissioner’s November 9, 2001, letter. Rather, they focused on the lack of irreparable harm to the plaintiffs and the serious effect on the public interest, particularly the insureds and ERPs involved. Thus, this Court will not, in the short time available, struggle to assess issues related to likelihood of success on the merits but will assume for these purposes only that legal errors were made that warrant some form of relief for Liberty Mutual and Premier. Instead, the Court will examine issues that relate to the possibility of monetary damages as an adequate remedy, and matters relating to the public interest.
The Court turns first to the public interest. Automobile insurance in Massachusetts is a highly regulated industry, and it exists with the overburden of mandatory insurance for any person owning a vehicle. CAR was created expressly to deal with issues relating to providing insurance coverage for persons that carriers were unwilling to service voluntarily. It is necessary to insure that all qualified applicants who are not able to obtain coverage voluntarily from insurers will not, for that reason, be unable to own and operate a motor vehicle in the Commonwealth. The automobile-owning public, who are not direct parties to this litigation, have a significant stake in its outcome. Can that public be protected without unduly imposing upon the insurance carriers who are otherwise necessary to keep the whole process viable?
The Commissioner and CAR argue that Liberty Mutual and Premier have not made a showing of irreparable harm, one of the criteria for the issuance of injunctive relief. They argue that the monetary loss that Liberty Mutual and Premier fear can be compensated through an order of this Court should Liberty Mutual and Premier prevail on the merits. In short, even if the Commissioner and CAR are legally wrong in their decisions, a money judgment will make the plaintiffs whole. The Commissioner and CAR point to Rule 11, C., Settlement of Balances, as providing this satisfactory monetary relief. The Court assumes that what is argued relates to Rule 11, C., secs. 2 and 3. Those sections read as follows:
2. The Governing Committee, subject to the approval of the Commissioner, may offer or allow a Servicing Carrier reimbursement in whole or in part for specific extraordinary expense incurred in qualifying for, continuing as, or ceasing to be, a Servicing Carrier. Such expense must be explained and supported in such detail as required by the Governing Committee, and must be in its judgment significantly in excess of the normal additional expense expected to be incurred by the Servicing Carrier, and must be actually incurred before reimbursement. The Servicing Carrier must petition the Governing Committee for such relief
3. The Governing Committee, subject to the approval of the Commissioner, may authorize reimbursement of Servicing Carriers for normal insurance business losses incurred in connection with CAR business. Such normal business losses shall be as defined and designated by the Governing Committee but shall not include any loss or expense occurred as a direct result of fraud or dishonesty on the part of the Servicing Carrier’s claims personnel..., and each Servicing Carrier shall hold CAR harmless from and reimburse it for any such loss or expense charged. The Servicing Carrier must petition the Governing Committee for such relief.
The Court is hesitant to embrace these provisions as wholly satisfactory under the circumstances. The foregoing two paragraphs provide some, but hardly total, comfort to Servicing Carriers. The mysteries of a G.L.c. 30A, Sec. 14 proceeding loom in the background. Clearly, an administrative process of some sort is contemplated before CAR — admittedly not a governmental agency — before any relief may be granted, unless, of course, this Court mandates a particular monetary result. Whether the Court has the power to mandate such relief is not something that time permits it to assay in this situation.
*202 At the same time, there is, on the one hand, a vehicle for monetary relief which may be affected somewhat affirmatively by an order of the Court, and, on the other, a certain serious public interest in making automobile insurance available to all who are properly on our roads and highways. “Economic harm alone . . . will not suffice as irreparable harm unless ‘the loss threatens the very existence of the movant’s business.’ Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987).” Tri-Nel Management, Inc., supra, 433 Mass. at 227-28. Consequently, this Court concludes that there is insufficient evidence of irreparable harm to the plaintiffs to grant the injunctive-type relief sought here.
The request for temporary or preliminary relief is DENIED.

 The Court infers that the CAR meeting was before the Agreement was executed because in Paragraph 1 of the Agreement there is inserted in handwriting a dollar number said to be “in accordance with the vote of the Governing Committee of October 17, 2001.”