Burnes, J.
INTRODUCTION
The plaintiffs, Lydia D. (“Lydia”) and Andrew T. (“Andrew”), (collectively “the plaintiffs” or “the children”), brought this action after they were ordered to leave[3] Boston Latin School (“BLS”) on Wednesday, December 3, 2003, based on the defendants’ determination that the children do not “actually live” in Boston. The children brought this suit against the defendants, Superintendent Thomas Payzant (“Payzant”), Chief Operating Officer Michael Contompasis (“Contompasis”), and Headmaster Cornelia Kelley (“Kelley”) (collectively “the defendants”), pursuant to G.L.c. 249, §4, alleging that the defendants’ decision to exclude the children from BLS was arbitrary and capricious, unsupported by substantial evidence and in violation of G.L.c. 76, §5, defendants’ own regulations and procedures, and due process. This matter is now before the court on Lydia and Andrew’s Motion for a Preliminary Injunction to restrain and prevent the defendants from excluding the children from attending Boston Latin School. For the reasons set forth below, the Plaintiffs’ Motion for a Preliminary Injunction is ALLOWED.
BACKGROUND
The facts were gathered from the parties’ affidavits.
During the 2002-03 school year, Lydia lived with her parents and her younger brother at 128 Wachusett Avenue in Arlington, MA. During the fall of 2002, Lydia’s parents contacted the Boston School Department and inquired about the BLS application process. They were told that Lydia could take the entrance exam as a non-resident and then, if she passed and was accepted to the school, she would have to move to Boston and show proof of her residence with two utiliiy bills, by July 31, 2003. Lydia’s parents also received a memorandum from the Department of Implementation,[4] outlining the Boston Public Schools’ Residency Verification Procedure.
During the fall of 2002, Andrew lived with his parents and his younger brother in Lincoln, MA. Andrew’s parents also reviewed the requirements for enrollment at BLS and understood that if accepted for the 2003-04 school year, Andrew would have to establish residency in Boston by July 31, 2003.
On November 9, 2002, Andrew took the entrance examination for BLS, and on or around the same time, Lydia also took the test. In March of 2003, Lydia’s and Andrew’s parents were notified that their children had passed the entrance exam.
On April 9, 2003, Lydia’s parents re-financed their Arlington home and began attending “open houses” in Boston with the intent to purchase a home. Lydia’s parents found it was taking longer than expected to finalize a purchase of a Boston home, and so, mindful of the July 31st deadline, they entered into a lease for one bedroom of a two-bedroom apartment at 295 Commonwealth Avenue, Apt. 4B, on June 1, 2003. Lydia and her mother moved into the apartment at 295 Commonwealth Avenue, and stayed there during the week, while Lydia’s father and brother remained at the house in Arlington. On June 30, 2003, Lydia’s parents made an offer to purchase Unit #6 at 1840 Commonwealth Avenue, but their offer was not accepted. Subsequently, they made an offer to purchase Unit #8 at 31 Queensberry Street. This offer was accepted on September 15, 2003 and the closing took place on October 22, 2003. On or about October 29, 2003, Lydia and her mother moved from 295 Commonwealth Avenue to the Queensberry Street condominium. Since June 1, 2003, Lydia and her mother have been continuously spending the five school nights, first at 295 Commonwealth Avenue, and now at the Queensberry Street unit, in Boston. Lydia and her mother spend most weekends at the Arlington home with the rest of the family, and Lydia practices *273 the violin at the home in Arlington, during the weekday afternoons.
In late March 2003, Andrew’s parents re-financed their Lincoln home and started looking for a new home in Brighton, Allston, the South End and the Fenway area. Andrew’s parents found they could not afford to purchase a home in Boston without first selling their Lincoln home. Since they too were aware of the July 31st deadline, they began renting an apartment at 2 Tyler Street at the beginning of July and put their Lincoln home on the market. Andrew and his mother moved into the apartment at 2 Tyler Street and stayed there five to six nights a week, while Andrew’s father and brother remained at the home in Lincoln. Before July 31, 2003, Andrew’s mother went to the Department of Implementation and submitted copies of two utility bills from the 2 Tyler Street apartment, as proof of residency. Since the commute from Tyler Street to BLS was too far for Andrew, the family signed a lease on October 17, 2003, for a different apartment at 15 Park Drive. Andrew and his mother moved, while the family continued searching for a Boston home to purchase. During most weekends, Andrew and his mother spend time in Lincoln with his father and brother, although sometimes the family spends the weekend in Boston.
The Department of Implementation was satisfied that Andrew and Lydia had complied with the residency requirements and the students began their seventh grade school year at BLS. In late September/early October, the BLS Assistant Registrar, John Bunker, told Assistant Headmaster Philip Haberstroh (“Haberstroh”) that two students at BLS, Lydia and another student referred to as David C., shared the address of 295 Commonwealth Avenue. Shortly thereafter, on a school day at approximately 8:30 a.m., Haberstroh contacted David C.’s father by telephone at the 295 Commonwealth Avenue apartment. David C.’s father told Haberstroh that he rented a room to Lydia and her mother. Haberstroh asked to speak to Lydia’s mother, and David C.’s father told him that she was not there. Haberstroh immediately dialed Lydia’s contact number, which had a 781 area code and that he understood was an Arlington number. Lydia’s mother answered the phone and when Haberstroh asked her why she was at an Arlington number, she told him that she returned to Arlington after Lydia left for school.
In late September/early October, a teacher from BLS found a cellular phone at the school and gave it to Haberstroh. The number that was programmed in the cell phone under the heading “Home” had a 781 area code. Haberstroh dialed the “Home” number and Andrew’s father answered. Andrew’s father told Haberstroh that Andrew and his mother were living with another family at 2 Tyler Street, specifically for the purpose of Andrew’s attending BLS. Andrew’s father also told Haberstroh that he and his wife would go “back and forth” between the Tyler Street apartment and the Lincoln home, and that they were not separated. Andrew’s father also told Haberstroh that the family was not living together in Boston because Andrew’s brother was attending public school in Lincoln.
Haberstroh provided the above information about Lydia and Andrew’s living situations to Eleanor Adams (“Adams”), Program Specialist in Boston Public Schools’ Student Assignment Office, for further investigation. In November of 2003, Kelley received an anonymous letter complaining that Lydia and Andrew were not living in Boston. In response to this letter, Kelley met with Haberstroh and asked him to investigate. Haberstroh told Kelley he too had received information indicating that Andrew and Lydia did not live in Boston and had referred the matter to Adams for further investigation. In mid-November of 2003, one of Andrew’s teachers gave Haberstroh a check that Andrew had brought in to pay for a field trip. The check listed the Lincoln address.
On November 26, 2003, Lydia’s parents asked her to take the new utility bills for the Queensberry Street condominium to school, but she did not have time to deliver them. Lydia’s parents also delayed updating their address with the school because the previous owner of the Queensberry Street condominium had lost the mailbox key. Lydia’s parents put the mail on hold while they waited for the realtor to search for the key. In the end they hired a locksmith to replace the lock.
On December 1, 2003, Contompasis received an anonymous letter complaining that Andrew and Lydia were not living in Boston. On that same day, the Boston Public School Attendance Supervisor, Lucille Fonseca (“Fonseca”), called Andrew’s mother to verify his Boston address. Andrew’s mother faxed Fonseca a copy of the lease for 15 Park Drive and a utility bill for that apartment. Fonseca told Andrew’s mother that she would update his record right away.
On December 2, 2003, Contompasis called Kelley and said he had information indicating that Andrew and Lydia did not actually reside in Boston and asked Kelley to begin an investigation. Kelley told Contompasis that an investigation had already been conducted which confirmed that Andrew and Lydia did not reside in Boston and that the matter was referred to Adams. Contompasis told Kelley that Andrew and Lydia would not be able to continue at BLS. Kelly instructed Haberstroh to take the necessary steps to withdraw Andrew and Lydia from school. Haberstroh then left a voice mall message at Lydia’s Arlington phone number, asking her parents to call him back as soon as possible. Lydia’s father left a voice mail for Haberstroh and e-mailed him their new Queensberry Street address and information about the deed. Haberstroh then called Lydia’s father at lunch time and told him that December 3rd would be Lydia’s last day at BLS *274 because she was not a Boston resident. Lydia’s father told Haberstroh that Lydia had been living at 295 Commonwealth Avenue and then moved to the unit on Queensberry Street. Haberstroh told Lydia’s father to contact Contompasis, because he was in charge of this issue. That same day, December 2nd, Lydia’s father left three voice mail messages for Contompasis, who did not return any of the calls.
On December 2, 2003, Haberstroh also contacted Andrew’s mother and informed her that Andrew would no longer be able to attend BLS because he did not live in Boston. Andrew’s mother said that she did not understand, since just the day before she had confirmed Andrew’s residency status with Fonseca. Haberstroh told Andrew’s mother that he did not have the power to change anything, that the Superintendent’s office had made the decision, and that she should contact the Superintendent or Contompasis. Andrew’s mother immediately called the Superintendent’s office and tried to speak with Payzant or Contompasis, but ended up leaving a voice mail message. She then called Fonseca, who said that Andrew’s record showed that his Boston residency was fine. Fonseca told Andrew’s mother that she would call Haberstroh and confirm Andrew’s residence and that it is her office (the Department of Implementation) which determines a student’s residency status, not the school.
On December 3,2003, three months into the school year, at about 9:00 a.m. Lydia’s and Andrew’s names were called over the loudspeaker and they were instructed to report to Haberstroh.[5] Haberstroh told Andrew and Lydia to return their books and not to return to school the next day.
Meanwhile, Andrew and Lydia’s parents did not yet know what happened to their children. At around 10:00 a.m. Lydia’s parents went to Contompasis’ office and his assistant told them he was in a meeting. Lydia’s parents explained that they were there to resolve the residency issue, and left a letter and a copy of the latest Queensberry Street utility bill for Contompasis. Later that day, the Ombudsperson, Maureen Lumley (“Lumley”), called Lydia’s father and said that she had their letter and bill and asked a few questions about where Lydia was living. Lydia’s father then learned what had happened to Lydia at school and left messages for Haberstroh, Kelley and Lumley. Lumley called Lydia’s father back and said the person in charge of the records had already left for the day. She also said that Kelley made the decision to expel Lydia and that the Superintendent’s office only assisted in the investigation. Lumley advised Lydia’s father to contact Boston Public Schools’ legal advisor, Peter Kelley (“P. Kelley”). Lydia’s father contacted P. Kelley, left a message, and never heard back from him.
At 2:18 p.m. on December 3, 2003, Andrew called his mother to tell her that he had been kicked out of school. Andrew’s mother told him to wait while she made some phone calls. Andrew’s mother tried to contact Fonseca, but she was unavailable, so instead Andrew’s mother spoke with Joanne in the Boston Public Schools Attendance Office. Joanne said that BLS should not have expelled Andrew and that he should report to school the next day. Joanne said she would call her boss, Dr. Phillip Jackson (“Dr. Jackson”), and she instructed Andrew’s mother to call Kelley and let her know that Dr. Jackson had approved Andrew’s residency record. Andrew’s mother called Andrew back and told him to go to his after-school activities as planned. Then she called Kelley and left a message. Kelley returned Andrew’s mother’s call at 4:30 p.m. and said that she had no power over the situation, and that Andrew could not attend school the next day unless the Superintendent’s office said he could.
On December 4, 2003, at 7:15 a.m. Andrew’s parents and Lydia’s father went to BLS to meet with Kelley and Haberstroh. At about 8:00 a.m. Haberstroh and Kelley told the parents that the Headmaster’s office had no control over the situation and directed them to contact the Superintendent’s office. Contompasis and P. Kelley agreed to meet with the parents at 3:30 p.m.
First, P. Kelley and Contompasis met with Andrew’s parents and told them that since they maintain two homes, Andrew was not a “legal resident” of Boston, despite the fact that Andrew and his mother stay at the Boston home five days a week. Andrew’s parents asked Contompasis what he relied on as his source for the definition of “legal resident,” and Contompasis replied that their W-2 and tax return did not list Boston as an address. Andrew’s parents explained that Andrew had applied to BLS as anon-resident and subsequently Andrew and his mother had physically moved into Boston, completed an Affidavit of Residency, complied with all the documentation requirements of the Department of Implementation, and that next year the tax return forms would list a Boston address. Contompasis said that Andrew and his family consider Lincoln to be their home in their heart, and that therefore Boston was not a “legal residence” for them. Andrew’s parents stated that they were actively searching to purchase a Boston home, sell their Lincoln home and intend to move the entire family to Boston as soon as possible. Andrew’s parents also inquired about the BLS procedure for expulsion and whether it had been followed in Andrew’s situation. Contompasis replied that Andrew was not expelled or suspended, he was merely ineligible to continue to attend Boston schools because he failed to meet the residency requirement.
Next, P. Kelley and Contompasis met with Lydia’s father and told him that even though he owned a home in Boston, Lydia was not a legal resident of Boston because her family owned another home in Arlington. Contompasis said that Lydia would be considered a legal resident of Boston if the entire family “severed *275 ties” with Arlington and moved to Boston. When Lydia’s father argued that this was not one of the requirements listed by the Department of Implementation, Contompasis responded that this was what the school’s requirements “implied." Lydia’s father said that if he had known that the whole family was required to move to Boston, he would have done so, or considered a private school for Lydia.
In his affidavit, Contompasis states that he based his decision to terminate Andrew and Lydia’s enrollment on the following documents: (1) a Verification of Address Request Form, filled out by Adams, stating that Andrew listed a number with the area code “781" as his home contact number;[6] (2) a Verification of Address Request Form, dated October 8, 2003, filled out by Adams, stating that Lydia’s parents signed an affidavit that they live at 295 Commonwealth Avenue, but now they say they are renting a room for Lydia; (3) an Affidavit of Parent or Guardian of Non-Resident Student in Support of Admission to a Boston Public Schools Examination School, filled out by Lydia’s parents; (4) a Verizon telephone bill for 295 Commonwealth Avenue, dated July 14, 2003; (5) an NSTAR electric account access webpage indicating service to 295 Commonwealth Avenue, printed on July 19,2003; (6) an NSTAR bill for 31 Queensberry Street, printed December 2, 2003 and indicating very little electric usage; and (7) a KEYSPAN bill for 31 Queensberry Street, dated November 21, 2003 and indicating very little gas usage.[7]
On December 9, 2003, Contompasis informed both Andrew’s and Lydia’s families, in writing, that he affirmed the decision that Lydia and Andrew did not actually reside in Boston, and that the children are no longer permitted to attend BLS. Lydia and Andrew maybe eligible to attend public school in Arlington and Lincoln, respectively.[8] Contompasis indicates in his affidavit that Lydia and Andrew can re-apply to BLS for ninth grade, if their families actually reside in Boston before the July 31st prior to their ninth grade year, and if they again achieve a qualifying score on the entrance examination.
DISCUSSION
I. Standard of Review
To obtain a preliminary injunction, the children must satisfy a threefold inquiry showing that they: (1) have a reasonable likelihood of success on the merits; (2) will suffer irreparable harm if the injunction is not granted; and (3) will suffer harm if the injunction is denied that outweighs the harm the defendants will suffer if the injunction is granted. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). In appropriate cases, and this is one, the court should also consider the risk of harm to the public interest. GTE Products Corp. v. Stewart, 414 Mass. 721, 723 (1993).
II. Likelihood of Success on the Merits
A. Standard of Review for Petitions for Certiorari
Pursuant to G.L.c. 249, §4, the plaintiffs seek review of the defendants’ decision that Andrew and Lydia are not residents of Boston. Certiorari review is the only way of reviewing otherwise unreviewable governmental decisions of a final nature. Mackenzie v. School Comm. of Ipswich, 342 Mass. 612 (1961). The standard for certiorari review varies according to the nature of the action of which review is sought. Forsyth School for Dental Hygienists v. Board of Registration in Dentistry, 404 Mass. 211, 217 (1989); FIC Homes of Blackstone, Inc., v. Conservation Commission of Blackstone, 41 Mass.App.Ct. 681, 684 (1996). When the governmental party has broad discretion, the court will regard its decision with deference and overturn it only if it is arbitrary and capricious. Sierra Club v. Comm’r of Dep’t of Envtl. Mgmt., 439 Mass. 738, 747-48 (2003). When the governmental party does not have broad discretion, the court may be less deferential and consider whether the agency had substantial evidence to decide as it did. “Substantial evidence” is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” Doherty v. Retirement Bd. of Medford, 425 Mass. 130, 134 (1997). In all instances, “(t]he standard of review in an action in the nature of certiorari is to correct substantial errors of law apparent on the record adversely affecting material rights.” Police Com’r of Boston v. Robinson, 47 Mass.App.Ct. 767, 770 (1999) (citations omitted).
G.L.c. 76, §5 states “(e]veiy person shall have aright to attend the public schools of the town where he actually resides ...” A town’s school system has no statutory authority to exclude from its schools a child who “actually resides” in that town. A town’s school system has no common-law authority to require that the entire family reside in the town for the child to establish that he or she “actually resides” in the town. See In Re Agawam Public Schools, BSEA #00-1395, January 5, 2000 (Exhibit B to Plaintiffs’ Memorandum), citing Board of Education v. School Committee of Amesbury, 16 Mass.App.Ct. 508 (1983) (to determine residence of child, one may consider where the parents reside but it is the child’s residence that controls).[9] A town’s school system may reasonably require proof of the child’s residency, as the Boston Public School System did here. Once the child establishes residency, however, the school system must admit the child to its schools. The school system has no discretion at this point; it cannot pick and choose among the eligible children in deciding who may attend its schools.
The appropriate standard of review, then, for this court is whether the defendants’ decision to exclude Lydia and Andrew was based on substantial evidence. *276 In addition, the court must consider whether the decision was based on an error of law. Therefore, for the purposes of considering the request for a preliminary injunction, this court will determine whether the plaintiffs have a reasonable likelihood of showing that the defendants’ decision — that Andrew and Lydia are not residents of Boston — was legally in error and not supported by substantial evidence on the record as a whole. See Bielawski v. Personnel Adm’r of Div. of Personnel Admin., 422 Mass. 459, 463 (1996).
B. The plaintiffs are likely to be able to show that the defendants’ decision that Andrew and Lydia are not residents of Boston was based on an error of law.
G.L.c. 76, §5 states, “(e)veiy person shall have a right to attend the public schools of the town where he actually resides ...” “The words ‘reside’ and ‘domicil’ as used in statutes relating to residency requirements, have been interpreted to be synonymous.” Watson v. Town of Lexington, on 1993 WL 818774, 1 Mass. L. Rptr. 261 (Mass.Super. 1993) (Fremont-Smith, J.). See Hershkoff v. Board of Registrars of Voters of Worcester, 366 Mass. 570, 576 (1974); Teel v. Hamilton Wenham Regional School District, 13 Mass.App.Ct. 345, 349 (1982). “A person’s domicil is usually the place where he has his home.” Hershkoff, 366 Mass, at 576 (citations omitted). “Home is the place where a person dwells and which is the center of his domestic, social and civil life.” Id. “A change of domicil takes place when a person with capacity to change his domicil is physically present in a place and intends to make that place his home for the time at least; the fact and intent must concur.” Id. “The domicil, or residence, of a minor child generally is the same as the domicil of the parent who has physical custody of the child.” George H. and Irene L. Walker Home for Children, Inc. v. Town of Franklin, 416 Mass. 291, 295 (1993).
In this case, the defendants committed an error of law by interpreting the words “actually residing” in G.L.c. 76, §5, to mean, specifically, that the whole family has to reside in Boston, without maintaining another home outside of Boston. G.L.c. 76, §5 states that every person shall have the right to attend the public schools of the town where he actually resides. The plain meaning of the word “he” in the statute refers to the child who seeks admittance to a public school system, not the entire family. “He” may include the parent who has physical custody of the child, because a minor child’s domicil is generally determined by that of the parent who has physical custody. Nothing in the case law supports the defendants’ notion that “he” refers to the whole family. This court concludes that Andrew and Lydia are more than reasonably likely to succeed in showing that the defendants’ decision that they are not residents of Boston because their entire families do not reside in Boston is based on an error of law.
C. The plaintiffs are likely to be able to show that the defendants’ determination that Andrew and Lydia are not residents of Boston is unsupported by substantial evidence.
The defendants point to four factors that the court should examine when determining whether a student “actually resides” in Boston for the purposes of G.L.c. 76, §5. First, the defendants argue that Boston was not the plaintiffs’ center of domestic, social and civil life because both of the plaintiffs’ fathers and siblings “actually reside” outside of Boston. This fact may tend to show that the children themselves also were not “actually residing” in Boston, but it is just as likely to show that the children’s families decided to sacrifice living together as a family unit in order to insure that Andrew and Lydia qualify for an education at BLS. The center of the children’s domestic, social and civil life may just as likely be in Boston with their mothers, while their fathers’ and siblings’ lives are centered in towns outside of Boston.
The defendants claim that since Andrew’s and Lydia’s siblings attend schools in Lincoln and Arlington, the families must “actually reside” in these towns and therefore Andrew and Lydia also “actually reside” in these towns. The statute does not require an entire family to “actually reside” in a town in order for the children to attend the public schools in that town. Therefore, the children’s siblings’ and/or families’ actual residence may be some, but it is not substantial, evidence of the children’s actual residence. The children can “actually reside” in Boston, while their siblings concurrently reside in other towns.
Second, the defendants urge the court to consider the children’s mailing addresses. Lydia’s family did not have access to the mailbox at the Queensberry Street unit, due to a missing key. The defendants infer that, therefore, Lydia must have listed her Arlington address with the school department. The defendants, the custodians of those records, provided the court with no evidence of which address Lydia actually had on file at the time the defendants made the decision that Lydia was not a resident, so an Arlington address cannot have been a basis for the decision. The defendants also assert that since Lydia’s gas and electric bills for the Queensberry Street unit indicate the use of a negligible amount of gas and electricity, she must have been residing in Arlington. Lydia’s father submitted these bills in response to discovering that Lydia had been ordered to leave school. Therefore, the defendants did not even possess these bills until after they made the decision to terminate Lydia’s enrollment at BLS. Furthermore, regardless of the bills’ content, they are evidence of Lydia’s intent to reside in Boston, which Contompasis has flatly ignored.[10]
The defendants also did not provide the court with evidence of which address Andrew had on file at the time of the defendants’ decision. The defendants state that the only phone number that Andrew had on file *277 with the school was the number to the home in Lincoln. Therefore, the defendants conclude that Andrew did not “actually reside” in Boston. Although the Lincoln phone number may be relevant in evaluating Andrew’s intent to remain in Boston, it is not substantial evidence that he did not “actually reside” in Boston. Andrew and his family may have many valid reasons for giving the school the Lincoln phone number. The residency procedures did not require listing a Boston phone number, and perhaps Andrew’s family preferred to direct all BLS communication to Andrew’s father in Lincoln.
The defendants’ third and fourth assertions are intertwined. The defendants’ third claim is that the families’ maintenance of residences in Lincoln and Arlington indicate that the children do not “actually reside” in Boston. The defendants’ fourth assertion is that the children, and their mothers, reside in Boston on a temporary basis, with the intent to return to these Lincoln and Arlington homes. The mere fact that the children’s families maintain an additional residence outside of Boston is. not substantial evidence that children do not reside in Boston. Again, the statute only requires that the student reside in Boston, not the entire family. However, the homes in Arlington and Lincoln may be relevant in determining Andrew and Lydia’s intent to remain in Boston. Presumably, the defendants infer that since the children’s families maintain residences in Lincoln and Arlington, the children intend to return there and do not intend to make Boston their home. Domicil and residence are established by both a physical presence and an intent to remain, at least for a while.
The defendants ignored evidence that the children intended to make Boston their residence.[11] Lydia’s family has already purchased a Boston home and Andrew’s parents are in the process of selling their home in Lincoln and buying one in Boston. Both sets of parents state an intent to move the entire family to the city. Both families rented apartments in Boston initially, in order to satisfy the Boston Public Schools’ requirement that the children establish residency in Boston by July 31, 2003.
These children are likely to succeed in showing that the defendants did not have substantial evidence for their decision to exclude the children from BLS, based at least on the following facts in the record:
The families followed the instructions published by the school department to establish the children’s residency in Boston.
The Department of Implementation, the department authorized by the Superintendent to review residency status, approved the steps the families took to establish Boston residency for their children.
As of July 31, 2003, both Lydia and Andrew were sleeping in Boston five nights a week in rented quarters.
As of the date of the defendants’ decision, Lydia was sleeping five nights per week in a condominium owned by her family.
Both sets of parents continued to tiy to purchase a Boston residence for the entire family.
In addition, the children’s families’ mere ownership and/or maintenance of a home outside of Boston is not, by itself, substantial evidence that the children do not intend to make Boston their home
III. Irreparable Harm
These children will suffer irreparable harm if they “lose rights that cannot be vindicated should [they] prevail after a full hearing on the merits.” Planned. Parenthood League of MA., Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990).
Lydia and Andrew have been prevented from attending BLS since December 3, 2003. Each day they are away from their classes harms them academically and socially. Andrew and Lydia might be able to return to school in Lincoln and Arlington, respectively.[12] If they succeed on the merits, however, and are allowed to return to BLS after a full hearing, they will not be on track with the demanding curriculum and it may be impossible for them to catch up and finish their seventh grade year with the rest of their class. Should the children succeed at trial, the defendants would be incapable of compensating these children for each day that they missed at such a prestigious and demanding school as BLS. The defendants argue that the children are not harmed because they can attend other public schools and then re-apply to BLS before their ninth grade year by retaking the test and establishing residency. The children, however, will have lost the benefit of a higher quality of education for those two years. Also, there is no guarantee that Lydia and Andrew will be admitted in their ninth grade year, because the competition could be more intense. These children have established that they will suffer serious irreparable harm from the defendants’ actions.
IV. Balance of the Harm
Lastly, the balance of the harm weighs in favor of Lydia and Andrew. The children have demonstrated that issuing a preliminary injunction preventing the defendants from excluding the children from BLS will prevent irreparable harm. Furthermore, granting the injunction will not harm the defendants. Two spaces at BLS have already been allocated to Andrew and Lydia and the administrative costs of admitting them have already been paid. The funds for Andrew’s and Lydia’s attendance at BLS during the 2003-04 school year have already been appropriated and there is no indication from the defendants that there would be any cost savings from Andrew and Lydia’s absence. BLS will presumably still need the same number of *278 teachers and classrooms, whether Andrew and Lydia attend or not. BLS will not be harmed financially in following years because, proceeding under Superior Court Standing Order 1-96, a final decision on the merits can be issued before the start of the 2004-05 school year and the court will order an expedited schedule.
In appropriate cases, the court should also consider the risk of harm to the public interest. GTE Products Corp., 414 Mass, at 723. While there is a great public interest in the outcome of this case on the merits, there is little harm to the public interest in issuing the preliminaiy injunction. BLS is a highly competitive program and parents of students who have been rejected by BLS have an interest in preserving the limited number of seats for students who actually reside in Boston. But the defendants have produced no evidence that should Andrew and Lydia be prevented from attending BLS until a ruling on the merits, another two students from a wait list would take their seats. Therefore, whether or not Andrew and Lydia continue to attend BLS during the course of this case does not affect those students who were rejected from beginning seventh grade at BLS. Boston taxpayers also have an interest in preserving BLS for Boston residents. The record indicates, however, that both Lydia’s and Andrew’s families currently pay property taxes, directly or indirectly, to the City of Boston, by either owning or renting in the city.
The public also has a substantial interest in Boston Public Schools’ and BLS’ maintaining consistent residency requirements and effectively communicating such requirements to applicants and their families. The public should be able to rely on the Department of Implementation’s approval of residency and should be able to be confident that a child’s education will not be disrupted mid-year because of a dispute concerning residency when the relevant facts are available prior to the start of the school year. Thus, neither the defendants, nor the public will suffer any substantial irreparable harm from issuing the injunction.
ORDER
It is therefore ORDERED that a preliminary injunction issue, restraining the defendants from excluding the plaintiffs from attending Boston Latin School, until further order of the court. In order to expedite the final resolution of this dispute pursuant to Standing Order 1-96, the court ORDERS the following schedule:
(A) The defendants are to file the administrative record on or before February 12, 2004.
(B) The plaintiffs are to file their Motion for Judgment on the Pleadings on or before March 12,2004.
(C) The defendants’ response is to be filed on or before April 12, 2004.
(D) The court will schedule a hearing on the motion on May 12, 2004, at 2:00 p.m.

 The plaintiffs claim they were expelled. The defendants claim that the students were not expelled, but that they are merely ineligible to continue to attend Boston schools because they fail to meet the residency requirements. The defendants characterize their acts as “excluding” the students from school. Because the court need not, at this juncture, consider the children’s due process rights, nothing turns on this distinction.

 The Department of Implementation serves the entire Boston Public school system, not just Boston Latin School.

 Haberatroh asked Andrew if he lived in Lincoln and Andrew replied that he did not.

 Contompasis does not explicitly say that he also relied on the fact that the school had found Andrew’s cell phone and that it listed a “781" area code number for "Home," although he mentions it in his affidavit and it clearly was important to the people making the decision to exclude Andrew from BLS. After the hearing, Andrew’s father submitted an affidavit explaining that this cell phone had been his and that he is the one that had programmed the “781" number as "Home." The mother’s cell phone has a “617" area code and the two phones are billed as a package. This is one plausible meaning, although there could be many others, including that Andrew just had not re-programmed the phone. Whatever the reason, the defendants never asked for an explanation.

 Contompasis could not have relied on either (6) the NSTARbill or (7) the KEYSPAN bill, in making his determination that Lydia is not “actually residing” in Boston. He did not have possession of these bills on December 2, 2003, when he notified Lydia’s and Andrew’s parents that their children could no longer attend BLS, nor did he possess these bills at 9:00 a.m. on December 3, 2003 when he ordered Lydia and Andrew to leave school and not return. Lydia’s father submitted these bills to Contompasis at about 10:00 a.m., on December 3, 2003, in response to Contompasis’ phone call on December 2, 2003, but before he knew his daughter had been kicked out of school.

 Ellen Digby, Attendance Officer/Court Liaison, Arlington Public Schools, submitted an affidavit stating that if Lydia is determined not to be eligible to attend BLS, she is eligible to go to school in Arlington and Arlington is ready and willing to admit her. Since the hearing on this matter, Andrew has submitted the affidavit of his father about an email communication between his father and the Lincoln schools indicating that, if Andrew lives five days a week in Boston, he is not eligible to attend the Lincoln schools.

 The Amesbury case acknowledges some of the many situations where a child may not reside with his or her parents: “split families, guardianships, children living with foster parents, relatives or friends and institutionalized children . . .” Board of Education v. School Committee of Amesbury, 16 Mass.App.Ct. 508, 512 (1983).

 Since the hearing, Lydia’s father has submitted an affidavit indicating that NSTAR has determined that the meter for the unit was not working. This fact is irrelevant to whether the defendants had substantial evidence to decide as they did on December 2 and 3, 2003, because they did not have the bills at that time. But even if it is not substantive evidence, it certainly will assist in evaluating the credibility of Lydia and her parents.

 The court is required to look at the entire record, even if the agency ignores part of that record, in order to determine whether there was substantial evidence to support the decision. See Pyfrom v. Commissioner of the Department of Public Welfare, 39 Mass.App.Ct. 621, 624-25 (1996).

 See footnote 6.